IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2015 NOV 20  AM 10: 51

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | | |
|---|---|---|
| INTERNATIONAL BIOMEDICAL, LTD., | § § | |
| PLAINTIFF, | § § | |
| V. | § § | CAUSE NO. 1-14-CV-397-LY |
| GENERAL ELECTRIC COMPANY AND DATEX-OHMEDA, INC. D/B/A GE HEALTHCARE, | § § § § | |
| DEFENDANTS. | § | |

## MEMORANDUM OPINION AND ORDER REGARDING CLAIMS CONSTRUCTION

Before the court in the above-styled and numbered cause are Plaintiff International Biomedical, Ltd.'s ("IBL") Opening Claim Construction Brief filed January 30, 2015 (Clerk's Doc. No. 47); Defendants General Electric Company and Datex-Ohmeda, Inc.'s (collectively "GE") Opening *Markman* Brief filed January 30, 2015 (Clerk's Doc. No. 46); IBL's Responsive Claim Construction Brief filed February 25, 2015 (Clerk's Doc. No. 53); GE's Responsive *Markman* Brief filed February 25, 2015 (Clerk's Doc. No. 52); the parties' Final Joint Claim Construction Statement filed May 7, 2015 (Clerk's Doc. No. 56); IBL's Response Regarding the Meaning of Certain Claim Terms in U.S. Patent No. 6,245,010 filed September 4, 2015 (Clerk's Doc. No. 62); GE's Supplemental Claim Construction Submission filed October 8, 2015 (Clerk's Doc. No. 70); and the claim-construction presentations of both parties.

The court held a claim-construction hearing on May 15, 2015. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). After considering the patents and their prosecution history, the parties' claim-construction briefs, GE's expert declaration, the applicable law regarding claim construction, and argument of counsel, the court now renders its order with regard to claim construction.

## I.        Introduction

The court renders this memorandum opinion and order to construe the claims of U.S. Patent Nos. 6,155,970 (the '970 Patent), 6,245,010 (the '010 Patent), 6,471,634 (the '634 Patent), 6,733,437 (the '437 Patent), and 7,264,586 (the '586 Patent) (collectively "the Asserted Patents"). IBL seeks declaratory judgement of noninfringement and invalidity of the Asserted Patents. GE asserts that IBL infringes various claims of the Asserted Patents. The Asserted Patents generally relate to products known as infant warmers. Collectively, the Asserted Patents contain 81 claims and encompass 43 pages.

## II.      Legal Principles of Claim Construction

Determining infringement is a two-step process. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996) ("[There are] two elements of a simple patent case, construing the patent and determining whether infringement occurred . . . ."). First, the meaning and scope of the relevant claims must be ascertained. *Id.* Second, the properly construed claims must be compared to the accused device. *Id.* Step one, claim construction, is the current issue before the court.

The court construes patent claims without the aid of a jury. *See Markman* 52 F.3d at 979. The "words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. The person of ordinary skill in the art is deemed to have read the claim term in the context of the entire patent. *Id.* Therefore, to ascertain the meaning of a claim, a court must look to the claim, the specification, and the patent's prosecution history. *Id.* at 1314–17;

*Markman*, 52 F.3d at 979.  Claim language guides the court's construction of a claim term.  *Phillips*, 415 F.3d at 1314.  "[T]he context in which a term is used in the asserted claim can be highly instructive."  *Id.*  Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent."  *Id.*  Differences among claims, such as additional limitations in dependent claims, can provide further guidance.  *Id.* at 1314–15.

Claims must also be read "in view of the specification, of which they are a part."  *Markman*, 52 F.3d at 979.  The specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (internal citations omitted).  In the specification, a patentee may define a term to have a meaning that differs from the meaning that the term would otherwise possess.  *Phillips*, 415 F.3d at 1316.  In such a case, the patentee's lexicography governs.  *Id.*  The specification may also reveal a patentee's intent to disclaim or disavow claim scope.  *Id.*  Such intention is dispositive of claim construction.  *Id.*  Although the specification may indicate that a certain embodiment is preferred, a particular embodiment appearing in the specification will not be read into the claim when the claim language is broader than the embodiment. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

The prosecution history is another tool to supply the proper context for claim construction because it demonstrates how the inventor understood the invention.  *Phillips*, 415 F.3d at 1317.  A patentee may also serve as his own lexicographer and define a disputed term in prosecuting a patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004).  Similarly, distinguishing the claimed invention over the prior art during prosecution indicates what a claim does not cover.  *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378–79 (Fed. Cir. 1988).  The doctrine

of prosecution disclaimer precludes a patentee from recapturing a specific meaning that was previously disclaimed during prosecution. *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). A disclaimer of claim scope must be clear and unambiguous. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002).

Although, "less significant than the intrinsic record in determining the legally operative meaning of claim language," the court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and treatises may help the court understand the underlying technology and the manner in which one skilled in the art might use a claim term, but such sources may also provide overly broad definitions or may not be indicative of how a term is used in the patent. *See id.* at 1318. Similarly, expert testimony may aid the court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* Extrinsic evidence may be useful when considered in the context of the intrinsic evidence, *id.* at 1319, but it cannot "alter a claim construction dictated by a proper analysis of the intrinsic evidence," *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1139 (Fed. Cir. 2004).

**III.   Discussion**

*A.     Agreed Constructions*

At the claim-construction hearing, IBL agreed to adopt one of GE's constructions. The court hereby adopts the agreed construction of the claim term listed in the table below.[1]

---

[1] Throughout, the **bolded** claim terms indicate the court's adopted construction.

| Claim Term/Phrase | Adopted Agreed Construction |
|---|---|
| "generally contiguous to" ['634 Patent] | generally in alignment with |

B.    *Disputed Terms*

The parties dispute the construction of 21 terms. Each disputed term is discussed separately.

1.    "base"

The parties' proposed constructions for this term, as used in claim 11 of the '970 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| "a pedestal attached to a wheel assembly" | Plain and ordinary meaning; no further construction is necessary. |

IBL argues that the term "base" was used differently in the '970 Patent compared to the other Asserted Patents. IBL's argument centers on language in the specification describing the "base 48 that may include a pedestal 50 having wheels 52 so that the infant warmer 46 is readily movable." '970 Patent, 5:8–10. IBL contends that the term "base" as used in the remaining patents refers to the wheel assembly at the bottom of the of the infant warmer.

GE argues that the term would be understood by a person of ordinary skill in the art and should be given its plain and ordinary meaning. GE's expert defined a person of ordinary skill in the art for the '970 Patent as a person with at least two years of experience in industrial or mechanical design or equivalent, as well as at least one year of designing or working with medical devices. GE notes that the specification provides that the base *may* include a pedestal and wheels and argues that

nothing in the claim language or intrinsic record indicates that the base *must* include a pedestal and wheels.

A court may depart from the plain and ordinary meaning of a claim term in only two instances: lexicography and disavowal. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). Nothing in the specification indicates that the patentee acted as his own lexicographer to define the term "base" in a specific way. Therefore, to conclude that the term requires construction beyond its plain and ordinary meaning, the court would need to find "that the specification [or prosecution history] makes clear that the invention does not include a particular feature, or is clearly limited to a particular form of the invention." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001); *see also Hill-Rom*, 755 F.3d at 1372.

> [A]bsent some language in the specification or prosecution history suggesting that the [limiting feature] is important, essential, necessary, or the "present invention," there is no basis to narrow the plain and ordinary meaning of the term . . . . There are no magic words that must be used, but to deviate from the plain and ordinary meaning of a claim term to one of skill in the art, the patentee must, with some language, indicate a clear intent to do so in the patent.

*Hill-Rom*, 755 F.3d at 1373.

The language of claim 11 of the '970 Patent claims an "infant care apparatus comprising a base and a mattress tray supported on said base." '970 Patent, 6:67–7:1. The court agrees with GE that nothing in the claim language or the specification indicates that the base must include a pedestal and wheels. The embodiment described in the specification provides that the base *may* include a pedestal and wheels. The specification does not support a construction of this term in a way other than the plain and ordinary meaning of the words as they would be understood by a lay person, much less one of ordinary skill in the art. The court concludes that the term is to be given its **plain and ordinary meaning** with no further construction required.

6

2.      "mattress tray"

The parties' proposed constructions for this term, as used in claim 11 of the '970 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
| --- | --- |
| "a tray that holds the mattress" | Plain and ordinary meaning; no further construction is necessary. |

IBL contends that the term "mattress tray" needs construction but offers no argument.  IBL states in its opening brief that the proposed construction "simply states the basic structure of the claimed feature."  To support its construction, IBL uses language from the specification that states "a mattress 28 fits within the mattress tray 26 for comfort of the infant."  '970 Patent, 3:22.  IBL relies on the word "within" to justify limiting the claim term to a tray that holds or contains the mattress.

GE argues that the term should be afforded its plain and ordinary meaning because it would be understood by a person of ordinary skill in the art.  GE notes that the word "holds" in IBL's proposed construction does not appear anywhere in the '970 Patent.  GE argues that the mattress tray is described in the '970 Patent as supporting the mattress rather than holding it.

The court finds that nowhere in that body of the patent does the patentee define mattress tray in a way different from the plain and ordinary meaning of the term as would have been understood by a person having ordinary skill in the art of the invention.  Nor does the patentee disavow claim scope or indicate exclusions or restrictions on the term.  Claim 11 of the '970 Patent claims an "infant care apparatus comprising a base and a mattress tray supported on said base, means to provide heat to the infant supported on said mattress tray."  '970 Patent, 6:67–7:2  The usage of "mattress tray" in the claims is clear, and there is no indication that further definition is required by the context of the

7

claims or specification.  There is no indication in the intrinsic record that the court need adopt IBL's rewriting of the disputed claim phrase, as each of the words—alone and in conjunction—have an easily understood meaning.  "Courts cannot rewrite claim language."  *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) (citation omitted).  The court therefore concludes that the term is to be given its **plain and ordinary meaning** with no further construction required.

> 3.     "means to provide heat to the infant supported on said mattress tray"

The parties' agree that this term is subject to and governed by Title 35 of the United States Code, Section 112(f).[2]  The parties' proposed constructions for this term, as used in claim 11 of the '970 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| Means-Plus-Function<br><br>Function:  providing heat to an infant on the mattress tray<br><br>Structure:  a quartz heating element that provides heat directly downwardly towards an infant resting upon a mattress | Means-Plus-Function<br><br>Function:    to provide heat to the infant supported on the mattress tray<br><br>Structure: a heater unit, and equivalents thereof |

IBL argues that the specification references only a single structure that can perform the claimed function.  The specification refers to Figure 5 and describes a "heater unit 56 and which may be a quartz heater that provides the heat directly downwardly towards an infant resting upon a

---

[2]  The America Invents Act replaced Section 112, paragraph 6 with Section 112(f) for all patent applications filed after September 15, 2012.  Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) (codified in scattered sections of 35 U.S.C.).  To avoid confusion, the court will refer to subsections consistent with the current version of the statute.  Throughout this opinion and order, the court will refer to this provision simply as "Section 112(f)."

mattress 58." '970 Patent, 5:11–13.  IBL argues the heater unit referenced two times in the '970 Patent merely refers to a "black box" lacking required specific structure.  IBL argues that the "heating and air ducting mechanism" described for the embodiment in the form of an incubator lacks any specific recitation of structure.

GE contends that the function as explicitly recited in the claim language should be used, and that IBL's modified wording is improper.  GE asserts that the corresponding structure described in the specification is a "heater unit." '970 Patent, 5:11.  Further, GE argues that it is improper to limit the heater unit to a quartz heater, because the quartz heater is described in relation to an infant warmer that is one of multiple embodiments in the specification corresponding to the claimed function.  GE notes that the specification describes an embodiment in the form of an incubator that would utilize a "heating and air ducting mechanism." '970 Patent, 2:62–63.

The "means-plus-function" technique of claim drafting is a "convenience" for patentees that allows the expression of claim limitations in functional terms "without requiring the patentee to recite in the claims all possible structures" that could be used as a means in the invention.  *Medical Instrumentation & Diags. Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir.2003); *see also* 35 U.S.C. § 112(f).  In return for this drafting convenience, patentees must disclose, in the specification, a corresponding structure for performing the claimed function.  *See Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318 (Fed. Cir. 2012).  "If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid the price but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification." *Med. Instrumentation*, 344 F.3d at 1211.

The court agrees with GE that the function of the claim is clear from the claim language.  IBL concedes the proposed constructions of function do not differ substantively  The court concludes the function is: **to provide heat to the infant supported on the mattress tray**.

The court looks to the specification for disclosure of structure to perform the claimed function.  The specification describes the structure as a heater unit or a heater mechanism.  The specification also states that the heater unit "*may* be a quartz heater that provides the heat directly downwardly." '970 Patent, 5:12–13 (emphasis added).  The word "may" indicates that the patentee did not intend to limit the disclosed class of structures to only quartz heaters.  The patentee must demonstrate an intention to limit claim scope, and "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004).  The court agrees with GE that a person of ordinary skill in the art would understand the term "heater unit" to define a specific class of structures that *may* include quartz heaters.  Accordingly, the court concludes the disclosed structure is a **heater unit**.

4.   "mounting means adapted to mount said mattress tray to said base to be rotatably movable about a central pivot point to enable said mattress tray to rotate 360 degrees about said central pivot point"

The parties' agree that this term is subject to Section 112(f).  The parties' proposed constructions for this term, as used in claim 11 of the '970 Patent, are listed in the following table:

10

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| Means-Plus-Function<br><br>Function:  attaching the mattress tray to the base so that the mattress tray rotates 360 degrees about a central pivot point<br><br><br>Structure:  The tilt platform 38 including the pair of pins 40 extending outwardly therefrom that rest in a notch in the base and the set of stubs 42 extending upwardly from the tilt platform 38; the translation platform 24 having the radiused sides 32, the slots 44 defined therein, and the cylindrical pin 46 extending upwardly from the translation platform 24; and the side guards 74 and 76 moveable between a raised position in which the mattress tray is prevented from rotating and a lowered position in which the mattress tray is permitted to rotate 360 degrees. | Means-Plus-Function<br><br>Function:  to mount the mattress tray to the base to be rotatably movable about a central pivot point to enable the mattress tray to rotate 360 degrees about the central pivot point<br><br>Structure:  a pivot, and equivalents thereof |

IBL argues that the mattress tray is not mounted directly to the base, but rather to the tilt platform.  Therefore, the tilt platform should be included in the structure necessary to mount the mattress tray to the base.  IBL contends the only corresponding structure disclosed in the specification that allows the mattress tray to be mounted to the base is related to the tilt platform and the translation platform as described in IBL's proposed construction of the structure.  IBL further notes that in order to rotate the mattress tray 360 degrees, the side guards must be lowered.

GE contends that the function as explicitly recited in the claim language should be used.  GE argues that the IBL improperly includes a number of structures in IBL's proposed construction that are unnecessary for performing the claimed function.  The specification states that the structure that rotatably affixes the mattress tray to the translation platform may be a pivot of conventional design.

IBL concedes that the parties agree on the claimed function; however, IBL seeks to import the term "attaching" into the function.  The court agrees with GE's recitation of function that incorporates the precise claim language.  The court adopts the construction of the function to be: **to mount the mattress tray to the base to be rotatably movable about a central pivot point to enable the mattress tray to rotate 360 degrees about the central pivot point**.

The court agrees with IBL that more structure than a pivot is needed to perform the claimed function and that sufficient structure is disclosed in the specification.  GE's proposed structure of a pivot would enable a mattress tray to be rotatably movable 360 degrees about a central pivot point. But the pivot disclosed, without more, does not mount the mattress tray to the base.  The specification discloses "the mattress tray 26 is rotatably affixed to the translation platform 24 such that it can rotate 360 degrees and such means may be a pivot 46 of conventional design."  970 Patent, 4:32–35.  GE does not explain how a means for rotatably affixing the mattress tray to the translation platform provides sufficient structure for mounting the mattress tray to the base.

The structure that mounts the mattress tray to the base is disclosed in the specification.  The specification discloses a combination of structures that, taken together, perform the claimed function. The court adopts the construction of the structure to be: **a pivot affixed to a translation platform, said translation platform fitted atop a tilt platform**.

5.      "means to translate said mattress tray along a straight linear path."

The parties' agree that this term is subject to Section 112(f).  The parties' proposed constructions for this term, as used in claim 15 of the '970 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| Means-Plus-Function | Means-Plus-Function |
| Function: moving the mattress tray along a straight line | Function: to translate said mattress tray along a straight linear path |
| Structure: The tilt platform 38 having the set of stubs 42 extending upwardly therefrom; the translation platform 24 having the slots 44 defined therein and the cylindrical pin 46 extending upwardly from the translation platform 24; and the side guards 74 and 76 moveable between a raised position in which the mattress tray is prevented from moving along the straight linear path and a lowered position in which the mattress tray is permitted to move along the straight linear path. | Structure: a translation platform, and equivalents thereof |

IBL argues that the disclosed structure must include a number of structures described in the specification in order to perform the claimed function. IBL contends that all of the structures in IBL's proposed construction are necessary for the mattress tray to translate along a straight line. GE argues that IBL's proposed construction is cumbersome and includes additional limitations unnecessary to perform the claimed function.

IBL seeks to replace the term "translate" with the term "moving" in its proposed construction of the function. However, IBL uses both terms interchangeably in its claim-construction briefing, and both terms are used in the specification. The court agrees with GE's recitation of function that incorporates the precise claim language. The court adopts the construction of the function to be: **to translate the mattress tray along a straight linear path**.

The court agrees with IBL to the extent that the disclosed structure required to perform the claimed function includes more than a translation platform. As disclosed in the specification, the

13

translation platform fits atop the tilt platform and can be moved along the top surface of the tilt platform.  The translation platform contains parallel slots.  The tilt platform contains parallel stubs that are necessary to translate the translation platform along a straight linear path.  The stubs constrain movement, guide the translation platform, and prevent misalignment.  The court adopts the construction of the structure to be: **a translation platform containing parallel slots with interfitting parallel stubs**.

> 6.      "a generally planar infant bed affixed to said frame"

The parties' proposed constructions for this term, as used in claims 1 and 7 of the '010 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| a generally flat bed that is connected to and cannot move relative to the frame | Plain and ordinary meaning; no further construction necessary. |

IBL argues the term "affixed," although not used in the specification with reference to the infant bed, is used several times in the '010 Patent to describe parts rigidly secured together.  Also, that the '010 Patent fails to suggest the bed surface can move relative to the frame or the radiant heater.

GE argues the claim term would be understood by a person of ordinary skill in the art and lay jurors alike.  GE contends that IBL's rewriting of the claim language is inconsistent with the meaning of the term affixed.  Nothing in the intrinsic record suggests or requires that the bed cannot move relative to the frame.  Further, claims 1 and 7 of the '010 Patent state that a radiant heater is affixed to the frame, and the heater is described in the specification as movable relative to the frame.

The court agrees with GE.  The patentee does not act as his own lexicographer defining affixed in a specific way and there is no express disclaimer.  The patentee merely provides examples of how certain parts of the invention are or could be affixed.  Some parts that are affixed prohibit relative motion and some do not.  The court concludes that the term is to be given its **plain and ordinary meaning** with no further construction required.

      7.      "impinge upon said planar infant bed in a substantially uniform pattern"

The parties' proposed constructions for this term, as used in claims 1 and 7 of the '010 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| provide radiant energy to the infant bed such that the radiant energy is substantially the same at every point on the surface of the infant bed | Plain and ordinary meaning; no further construction necessary. |

IBL argues that the heat must be uniform over the entire mattress surface.  To support this argument, IBL points to the prosecution history.  IBL contends the patentee used the term "evenly distributed" to distinguish a specific prior art reference, and the use of this term limits the scope of claim.

GE argues that the intrinsic evidence does not evince any intent of the patentee to deviate from the plain and ordinary meaning of the claim language.  GE notes that the "same at every point" language proposed by IBL is not found in the '010 Patent or the intrinsic record.  GE contends that a substantially uniform pattern does not require the radiant energy to be substantially the same at every point on the surface—it is the pattern that must be substantially uniform.

The patentee responded to an obviousness objection regarding the design of the reflector used in the '010 Patent.  The patentee's response letter relied on by IBL utilizes the terms "fairly uniform

pattern," "fairly even distribution," "evenly distributed," "generally uniform heating," and "uniform application" to describe the reflected radiant heat.  The response letter highlights that the novel concept is the way the uniform pattern is generated—the design of the reflector.  The court agrees with GE that the response letter does not evince an intent of the patent owner to limit the scope of the claims by requiring that the radiant energy be substantially the same at every point on the surface. IBL concedes, and emphasizes in its opening claim construction brief, that it is a necessary attribute of the apparatus to provide a fairly uniform pattern of infrared energy.

A person of ordinary skill in the art would recognize that for a given heat source, the shape of a reflector will generate a specific pattern of reflection.  A nonuniform pattern could result in hot and cold zones—excessively warming an infant in one body location while realizing insufficient warmth in another.  The patent does not teach, as IBL contends, that all parts of the infant are warmed to the same temperature.  The requirement of a uniform pattern teaches a person of ordinary skill in the art that the pattern should provide an appropriate level of radiant energy on the surface of the infant bed.  Specifically, excessive warmth in one location and insufficient warmth in another is to be avoided.  The patent does not require that there be no variation in radiant energy over the entire surface.  The court concludes that the term is to be given its **plain and ordinary meaning** with no further construction required.

8.  "said reflector . . . formed in the geometric shape selected from the group consisting of an ellipsoid, a paraboloid and a hyperboloid"

The parties' proposed constructions for this term, as used in claims 1, 7, and 8 of the '010 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| a continuous uniformly-formed surface of revolution that fully encircles, without any interruptions or openings, the infrared emitter, the reflector being formed from one of the following shapes:<br>(1) "Ellipsoid" – A closed three-dimensional shape formed by rotating an elliptical line 360 degrees around a single axis to define the continuous uniformly-formed surface in which every point on the surface satisfies the following equation:<br><br>$$\begin{pmatrix} x[u,v] \\ y[u,v] \\ z[u,v] \end{pmatrix} = \begin{pmatrix} a\,\mathrm{Cos}[u]\,\mathrm{Cos}[v] \\ b\,\mathrm{Cos}[v]\,\mathrm{Sin}[u] \\ c\,\mathrm{Sin}[v] \end{pmatrix}$$<br><br>for a single a, b, and c.<br><br>(2) "Paraboloid" – A three-dimensional shape formed by rotating a parabolic line 360 degrees around a single axis to define the continuous uniformly-formed surface in which every point on the surface satisfies the following equation:<br><br>for a single a, b, and c.<br><br>$$\begin{pmatrix} x[u,v] \\ y[u,v] \\ z[u,v] \end{pmatrix} = \begin{pmatrix} u \\ v \\ a\,(u^2+v^2) \end{pmatrix}$$<br><br>(3) "Hyperboloid" – A three-dimensional shape formed by rotating a pair of quadratic lines around a single axis to define two continuous uniformly-formed surfaces in which every point on the surfaces satisfies the following equation:<br><br>$$\begin{pmatrix} x[u,v] \\ y[u,v] \\ z[u,v] \end{pmatrix} = \begin{pmatrix} a\,\mathrm{Cosh}[u]\,\mathrm{Cosh}[v] \\ b\,\mathrm{Cosh}[v]\,\mathrm{Sinh}[u] \\ c\,\mathrm{Sinh}[v] \end{pmatrix}$$<br><br>for a single a, b, and c. | Plain and ordinary meaning; no further construction necessary. |

IBL argues that the reflector must be formed as an ellipsoid, a paraboloid, or a hyperboloid and no other shape. IBL notes that the mathematical definitions it proposes are included in the

intrinsic record.  The patentee provided these equations in a response letter to an obviousness rejection during prosecution.  IBL contends the reflectors must be continuous, uniformly formed surfaces that fully encircle the source of the infrared energy, because the patentee used those words in the same response letter.  Finally, IBL argues that there can be no openings or interruptions because the patentee distinguished prior art as having openings at the ends.

GE argues that the intrinsic record does not warrant any special construction or exact precision regarding the shape of the reflectors.  Citing to the intrinsic record, GE argues that reflectors should have the general shape of an ellipsoid, paraboloid, or hyperboloid.  GE notes the distinction made in the objection-response letter is a narrow one, directed at the problematic ends of the overhead rectangular-style heaters in the prior art.  Relying on expert testimony, GE further argues that a person of ordinary skill in the art would recognize the general shapes of the reflectors, and that practical considerations would require deviations from mathematically precise shapes.

The patentee's use of the phrase "consisting of" in the claim language may restrict the scope of the claim.  "The phrase 'consisting of' is a term of art in patent law signifying restriction and exclusion." *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1382 (Fed. Cir. 2000).  "However, while 'consisting of' limits the claimed invention, it does not limit aspects unrelated to the invention." *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331 (Fed. Cir. 2004).  The shape of the reflector is an aspect related to the invention disclosed in the '010 Patent.  The patentee's use of this phrase limits the shape of the reflector to an ellipsoid, a paraboloid, or a hyperboloid, and no other shape.

The distinguishing feature described by the patentee during prosecution—a reflector that fully surrounds the infrared emitter—is an inherent property of elliptical, parabolic, and hyperbolic

18

surfaces.  These surfaces do not have ends like the reflectors in the prior art.  Ellipsoids, paraboloids, and hyperboloids are all basically 360 degree continuous uniformly formed surfaces.  This does not necessarily mean that the reflector must be a continuous uniformly formed surface to be in the shape of an ellipsoid, paraboloid, or hyperboloid.  A reasonable person could find that a football is formed in the geometric shape of a hyperboloid, specifically a prolate spheroid, even though the surface of a football would not satisfy the mathematical definition of a hyperboloid at every point due to the discontinuities formed at the seams and laces.

IBL proposes that a person of ordinary skill in the art for the '010 Patent would have a bachelors degree in physics or engineering among other qualifications.  A reasonable person with an engineering or physics degree would recognize the shape of an ellipsoid, paraboloid, and hyperboloid without resorting to mathematical equations.  Further, Figures 5A, 5B, and 5C of the '010 Patent provide illustrations of each shape.  A person of ordinary skill in the art would understand the meaning and scope of the claim term in light of the specification.  The court adopts the following construction:  **said reflector . . . formed in the geometric shape of an ellipsoid, a paraboloid or a hyperboloid, and no other shape**.

9.      "said drawer is moved to a position inwardly with respect to either of said lateral sides of said infant platform" (claim 1) / "said drawer is moved to a position with respect to either of said lateral sides of said infant platform" (claim 7)

The parties' proposed constructions for this term, as used in claims 1 and 7 of the '634 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| Invalid under 35 U.S.C. § 112(b) | Plain and ordinary meaning; no further construction necessary. |

IBL argues that the claim requires the drawer to actually be moved from one position to another. IBL contends that by claiming an apparatus—a movable drawer—along with a method of using that apparatus—requiring the drawer to be moved—the claim is rendered indefinite because it is unclear when infringement occurs.

GE argues that the claim language uses commonly used terms that are clear on their face. Further, the term is not indefinite because a person of ordinary skill in the art would understand the scope of the claims with reasonable certainty. GE contends that the language does not create confusion and is simply describing the functional capabilities of the drawer.

A claim is indefinite if it does not reasonably inform a person of ordinary skill in the art of the claim scope. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1383–84 (Fed. Cir. 2005). A claim reciting both an apparatus and a method for using that apparatus is indefinite if it is unclear when infringement occurs. *Id.* at 1384. However, "apparatus claims are not necessarily indefinite for using functional language." *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008).

The court concludes that the claim is not indefinite. The claim terms are not ambiguous, and, after reviewing the disputed claim language in light of the intrinsic record, it is clear that the scope of the claim does not extend to a method of using the drawer. The claim language is simply reciting functional capabilities of the drawer. A person of ordinary skill in the art would understand the meaning and scope of the claim term in light of the specification. The court concludes that the term is to be given its **plain and ordinary meaning** with no further construction required.

10.     "to allow a person to sit alongside said lateral sides without encountering said drawer"

The parties' proposed constructions for this term, as used in claims 1 and 7 of the '634 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
| --- | --- |
| Invalid under 35 U.S.C. § 112(b) | Plain and ordinary meaning; no further construction necessary. |

IBL argues it is unclear from the claim language and the specification how the position of the drawer allows a person to sit alongside the infant platform. A person can sit alongside the platform no matter where the drawer is located. IBL contends that this lack of certainty of scope renders the claim indefinite. GE argues that the plain and ordinary meaning of the term is apparent in light of the specification, and the scope is reasonably certain to a person of ordinary skill in the art.

IBL fails to recognize that the position of the drawer is relevant to whether a person sitting alongside the infant platform will encounter the drawer. The court agrees with IBL that a person may sit alongside the platform without encountering the drawer when the drawer is in the central position. But the court disagrees with IBL that the claim scope is indefinite in light of the specification.

The specification describes the situation where a caregiver is sitting along either lateral side of the infant platform and in a position where the caregiver's knees encounter the drawer. Further, the specification describes that the base and the drawer create obstructions by preventing legs of a chair from sliding sufficiently underneath the platform. These descriptions indicate that when a caregiver is sitting alongside the platform and facing the infant, the drawer creates a physical obstacle that limits how close a person may be to the platform. This limitation is the problem that the invention seeks to overcome.

The court concludes that the claim is not indefinite. The position of the drawer is what allows a person to sit alongside the lateral sides of the infant platform without encountering the drawer. A person of ordinary skill in the art would understand the meaning of the claim term in light of the specification. The court concludes that the term is to be given its **plain and ordinary meaning** with no further construction required.

11. "said base comprises a pair of C-shaped members oppositely positioned so as to have their free ends projecting outwardly toward the lateral sides of said infant care apparatus, wherein the inwardly directed center portion of said C-shaped members allow a chair to be placed beneath said infant care apparatus with [sic] encountering said base"

The parties' proposed constructions for this term, as used in claim 2 of the '634 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
| --- | --- |
| Invalid under 35 U.S.C. § 112(b) | "said base comprises a pair of C-shaped members oppositely positioned so as to have their free ends projecting outwardly toward the lateral sides of said infant care apparatus, wherein the inwardly directed center portion of said C-shaped members allow a chair to be placed beneath said infant care apparatus without encountering said base" |

IBL argues that the '634 Patent fails to explain how the base can allow a chair to be placed beneath the infant-care apparatus without encountering the base. IBL notes the '634 Patent discloses that the base member permits the placement of a chair very close, near, or adjacent to a lateral side of the apparatus. IBL contends that the claim is indefinite because it is unclear how the base allows a chair to be placed beneath the apparatus.

22

GE argues that, with the exception of a typographical error using the word "with" instead of "without," the claim is clear on its face.  GE contends that the plain and ordinary meaning of the term is apparent in light of the specification, and the scope is reasonably certain to a person of ordinary skill in the art.

The court concludes that the claim is not indefinite.  As with the previous term, a person of ordinary skill in the art would understand the meaning of the claim term in light of the specification. The court adopts GE's proposed construction that corrects an obvious and undisputed typographical error:  **said base comprises a pair of C-shaped members oppositely positioned so as to have their free ends projecting outwardly toward the lateral sides of said infant care apparatus, wherein the inwardly directed center portion of said C-shaped members allow a chair to be placed beneath said infant care apparatus without encountering said base**.

> 12.    "said base has a generally inwardly directed center section at both lateral sides of said infant care apparatus to enable a piece of furniture to be positioned beneath said infant care apparatus without encountering said base"

The parties' proposed constructions for this term, as used in claims 4 and 9 of the '634 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| Invalid under 35 U.S.C. § 112(b) | Plain and ordinary meaning; no further construction necessary. |

IBL argues that the '634 Patent fails to explain how the configuration of the base can enable a piece of furniture to be placed beneath the infant-care apparatus without encountering the base. IBL notes the '634 Patent discloses that the base member permits the placement of a chair very close, near, or adjacent to a lateral side of the apparatus.  IBL contends that the claim is indefinite because

it is unclear how the base allows a chair to be placed beneath the apparatus. GE argues that the plain and ordinary meaning of the term is apparent in light of the specification, and the scope is reasonably certain to a person of ordinary skill in the art.

The court concludes that the claim is not indefinite. The claim language describes the base as it is shown and described in the specification. A person of ordinary skill in the art would understand the meaning of the claim term in light of the specification. The court concludes that the term is to be given its **plain and ordinary meaning** with no further construction required.

13. "said drawer moves away from said center position by sliding in either of two directions along a path at a right angle with respect to said lateral sides of said infant platform"

The parties' proposed constructions for this term, as used in claim 8 of the '634 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| Invalid under 35 U.S.C. § 112(b) | Plain and ordinary meaning; no further construction necessary. |

IBL argues that, similar to claims 1 and 7, this claim requires the drawer to actually be moved from one position to another. IBL contends that by claiming an apparatus—a drawer that is adapted to slide—along with a method of using that apparatus—requiring the drawer to be moved—the claim is rendered indefinite because it is unclear when infringement occurs.

GE argues that the claim language is clear. Further, the term is not indefinite because a person of ordinary skill in the art would understand the scope of the claims with reasonable certainty, especially when read in light of the specification. GE contends that the language does not create confusion but simply describes the functional capabilities of the drawer.

The court concludes that the claim is not indefinite. The claim terms are not ambiguous, and, after reviewing the disputed claim language in light of the intrinsic record, it is clear that the scope of the claim does not extend to a method of using the drawer. The claim language is simply reciting functional limitations on the movement of the drawer. A person of ordinary skill in the art would understand the meaning and scope of the claim term in light of the specification. The court concludes that the term is to be given its **plain and ordinary meaning** with no further construction required.

14.    "means to sense an alarm condition indicative of a parameter of the apparatus or a condition of a patient supported on said surface"

The parties' agree that this term is subject to Section 112(f). The parties' proposed constructions for this term, as used in claim 1 of the '437 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
| --- | --- |
| Means-Plus-Function | Means-Plus-Function |
| Function: determining when an alarm condition indicative of a parameter of the apparatus or a condition of a patient supported on said surface exists or is present | Function: to sense an alarm condition indicative of a parameter of the apparatus or a condition of a patient supported on said surface |
| Structure: insufficient structure is disclosed | Structure: a sensor, and equivalents thereof |

IBL argues that insufficient structure is disclosed in the specification to perform the claimed function. The specification describes what the sensor does but not what the sensor is. The '437 Patent gives examples of possible alarm conditions but does not disclose what structure determines when an alarm condition exists. IBL further contends the only illustration of the alarm condition sensor is a black box labeled "alarm condition."

GE argues the claim language explicitly recites the claimed function, and IBL's construction improperly imports unrecited limitations into the claim. GE contends that the specification identifies

a sensor as the corresponding structure to perform the claimed function. Also, a person of ordinary skill in the art would understand the structure to be a sensor. GE notes that the specification provides examples of sensors to monitor blood oxygen levels, skin temperature, and the power to the radiant heater.

The court agrees with GE that the function of the claim is clear from the claim language. The court adopts the construction of the function to be: **to sense an alarm condition indicative of a parameter of the apparatus or a condition of a patient supported on the surface**.

The '437 Patent describes "an alarm condition sensor that continuously monitors a particular parameter and determines when an alarm condition exists." '437 Patent, 5:42–44. The specification provides several examples of sensors that can perform the claimed function and discloses that the sensor is configured in an electrical circuit. The court agrees with GE that a person of ordinary skill in the art would understand the term "sensor" to define a specific class of structures that can perform the claimed function. Accordingly, the court finds the disclosed structure to be a **sensor**.

15.    "means responsive to the sensed alarm condition to cause said audible alarm sounding device to produce an audible sound"

The parties' agree that this term is subject to Section 112(f). The parties' proposed constructions for this term, as used in claim 1 of the '437 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| Means-Plus-Function | Means-Plus-Function |
| Function: causing the audible alarm sounding device to produce an audible sound in response to the sensed alarm condition | Function: to respond to the sensed alarm condition to cause the audible alarm sounding device to produce an audible sound |
| Structure: insufficient structure is disclosed | Structure: an electrical circuit or sensor, and equivalents thereof |

IBL argues that insufficient structure is disclosed in the specification to perform the claimed function. The specification does not disclose the structure of any electrical circuit or sensor that performs the claimed function.

GE argues the claim language explicitly recites the claimed function, and IBL's construction improperly rewrites the claim language. GE contends that the specification identifies a sensor or an electronic circuit as the corresponding structure linked to the claimed function, and a person of ordinary skill in the art would understand that sensors and electrical circuits can perform the claimed function.

The court agrees with GE that the function of the claim is clear from the claim language. The court finds the function is: **to respond to the sensed alarm condition to cause the audible alarm sounding device to produce an audible sound**.

The specification discloses that the alarm condition sensor is configured in an electrical circuit. The court agrees with GE that a person of ordinary skill in the art would understand that an electrical circuit is used to perform the claimed function. Accordingly, the court finds the disclosed structure to be an **electrical circuit**.

16. "a non-hand contact alarm silence switch mounted within the patient care apparatus adapted to be activated without physical contact with a hand of a care provider to disable said audible alarm device"

The parties' proposed constructions for this term, as used in claim 11 of the '437 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
| --- | --- |
| Invalid under 35 U.S.C. § 112(b) | Plain and ordinary meaning; no further construction necessary. |

27

IBL argues the claim language is vague and indefinite, and therefore, the claim is invalid.  IBL contends that the '437 Patent does not disclose any switch that can be operated by physical contact, but not by contact with a hand.  IBL notes that the '437 Patent describes various switches that can be activated without any physical contact and a switch that can be operated by contact with a foot.  IBL also notes that the independent claim is not limited to noncontact switches but nonhand contact switches.

GE argues the plain and ordinary meaning is clear in light of the specification.  Further, a person of ordinary skill in the art would understand the claim scope with reasonable certainty.  GE contends that IBL's argument is untethered to the indefiniteness standard and is insufficient to carry IBL's burden on invalidity.

The court finds that the claim is not indefinite.  A nonhand contact switch is defined by the patentee within the claim to be a switch that is adapted to be activated without physical contact with a hand.  In light of the specification, the claim does not require that it must be impossible to activate the switch by contact with a hand.  Therefore, the court adopts the following construction: **an alarm silence switch mounted within the patient care apparatus adapted to be activated without physical contact with a hand of a care provider to disable said audible alarm device**.

17.     "to silence the audible alarm."

The parties' proposed constructions for this term, as used in claim 11 of the '437 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
| --- | --- |
| To turn-off or disable the alarm sounding device so that no sound is emitted | Plain and ordinary meaning; no further construction necessary. |

28

IBL argue that the specification describes that activating the alarm silence switch to silence the alarm causes the alarm to turn-off or deactivate so that there is no sound. IBL contends that its construction is also consistent with the ordinary dictionary meaning of the word silence.

GE argues that the term would be well understood by a person of ordinary skill in the art in light of the specification and should be given its plain and ordinary meaning. GE contends that IBL's construction improperly imports the limitation that would require the alarm device itself to be turned off or disabled. Although the intrinsic record does use "shut-off" and "deactivate," these terms are used to describe what happens to the audible sound, not the alarm sounding device. Further, the word "disable" is used in claim 11, and the principle of claim differentiation presumes claims that use different words to have different meanings.

The definition of "silence" relied upon by IBL does not include "turn-off" or "disable." Nothing in the intrinsic record requires that the device be turned off or disabled. The specification does not support a construction of this term in a way other than the plain and ordinary meaning of the words as they would be understood by a lay person, much less one of ordinary skill in the art. The court concludes that the term is to be given its **plain and ordinary meaning** with no further construction required.

18.     "an infant platform on which an infant is adapted to be positioned" (claim 1) / "a base having an infant platform on which an infant is adapted to be positioned" (claim 16)

The parties' proposed constructions for this term, as used in claims 1 and 16 of the '586 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| Invalid under 35 U.S.C. § 112(b) | Plain and ordinary meaning; no further construction necessary. |

IBL argues that the claim is indefinite and invalid because it is unclear from the '586 Patent how an infant is adapted to be positioned.  It is the infant that the claim requires is adapted to be positioned, not the platform.  IBL contends that the patent teaches how the infant platform may be adapted to support an infant, but the patent does not disclose any adaptations to be made to the infant.

GE argues that the term would be understood by a person of ordinary skill in the art in light of the specification, and the term should be given its plain and ordinary meaning.  GE notes that the specification discloses adaptations to be made to the infant platform—not to the infant—and uses the report of an expert to support its argument.

IBL has provided no evidence that a person of ordinary skill in the art would not understand the claim scope with reasonable certainty.  The court agrees with GE that, despite the awkward claim language, a person of ordinary skill in the art would understand the claim scope in light of the specification.  The court concludes that the term is to be given its **plain and ordinary meaning** with no further construction required.

19.     "the controller being programmed to provide a pre-warm cycle to energize the radiant heater in advance of placing an infant on the infant platform for a period of time to warm the infant platform"

The parties' proposed constructions for this term, as used in claim 1 of the '586 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| a microprocessor that is programmed to provide a pre-warm cycle so long as an infant is not present on the infant platform | Plain and ordinary meaning; no further construction necessary. |

IBL argues the claim requires more than a controller that can turn on the heat before the infant is placed on the infant platform; the controller must also be able to determine whether an infant is present. IBL notes prosecution history to support its position. During prosecution the patentee argued that prior art references did not disclose warming cycles where an infant is not present.

GE argues the term should be given its plain and ordinary meaning because it would be understood by a person of ordinary skill in the art in light of the specification. GE contends that IBL's attempt to limit the scope of a controller to a microprocessor is inappropriate in light of the specification. The '586 Patent states that a microprocessor is one possible embodiment of a controller, and the patentee has not expressed an intent to limit a controller to a microprocessor. GE also argues that IBL's proposed construction violates the principle of claim differentiation by importing the distinguishing feature of dependant claim 8 into claim 1.

A simple rearrangement of the claim language makes clear the plain and ordinary meaning of the claim. The court adopts the following construction: **the controller being programmed to provide a pre-warm cycle to energize the radiant heater for a period of time to warm the infant platform in advance of placing an infant on the infant platform**.

20.   "pre-warm cycle"

The parties' proposed constructions for this term, as used in claim 1 of the '586 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| an operation mode in which the controller causes power to be supplied to the radiant heater only when any infant is not present on the infant platform and until one of two conditions is satisfied: (1) a desired temperature of the infant platform is reached or (2) when the controller determines an infant is present on the infant platform | Plain and ordinary meaning; no further construction necessary. |

IBL argues that the term is limited by the description in the specification and statements made during prosecution. IBL contends that the '586 Patent teaches that the pre-warm cycle ends when the surfaces reach the desired temperature.

GE argues that the term would be well understood by a person of ordinary skill in the art in light of the specification and should be given its plain and ordinary meaning. GE contends that IBL's proposed construction improperly imports limitations into the claim that are not supported by the specification. Further, IBL's proposed construction renders dependant claim 8 meaningless.

The patentee did not express an intent to limit claim scope to the extent IBL proposes. However, the court agrees with IBL that the '586 Patent does use the term pre-warm cycle in a specific way. Considering the claim language in light of the specification and prosecution history, the court adopts the following construction: **a period of time to warm the infant platform in advance of placing an infant on the infant platform**.

21.    "a signal means to alert a user when the radiant heater has been energized for a sufficient period of time during the pre-warm cycle to allow an infant be placed on the warmed infant platform."

The parties' agree that this term is subject to Section 112(f). The parties' proposed constructions for this term, as used in claim 1 of the '586 Patent, are listed in the following table:

| Plaintiff IBL's Proposed Construction | Defendant GE's Proposed Construction |
|---|---|
| Means-Plus-Function | Means-Plus-Function |
| Function:  providing an indication to a user when the infant platform reaches a temperature set by the care-giver | Function:  to alert a user when the radiant heater has been energized for a sufficient period of time during the prewarm cycle to allow an infant to be placed on the warmed infant platform |
| Structure:  no structure is disclosed that performs this function | Structure:  electrical controls for providing an audible or visual signal or both, and equivalents thereof |

IBL argues that insufficient structure is disclosed in the specification to perform the claimed function.  The specification does not disclose the structure of any device that would provide the actual indication to alert the user.  Further, the testimony of an expert cannot be used as a substitute for the intrinsic record.

GE argues the claim language explicitly recites the claimed function, and IBL's construction improperly rewrites the claim language.  GE contends that the specification identifies electrical controls as the corresponding structure linked to the claimed function, and a person of ordinary skill in the art would understand that electrical controls can perform the claimed function because control modules incorporate lights and audible signals.

The court agrees with GE that the function of the claim is clear from the claim language.  The court finds the function is:  **to alert a user when the radiant heater has been energized for a sufficient period of time during the pre-warm cycle to allow an infant be placed on the warmed infant platform**.

The '586 patent specifically discloses "a control module 35 for containing various electrical controls" may be used and "includes a controller, such as a microprocessor." '586 Patent, 3:58–61.

The controller is described as activating the signal to alert the user. The electrical controls contained in the control module provide the actual indication—visual, audible, or both—to the user. The court agrees with GE that a person of ordinary skill in the art would understand that the control module, as disclosed, is used to perform the claimed function. Accordingly, the court finds the disclosed structure to be a **control module containing a controller and electrical controls**.

C.      *Summary Table of Adopted Agreed and Disputed Terms*

| Term/Phrase | Court's Adopted Construction |
|---|---|
| "generally contiguous to"<br><br>['634 Patent] | **generally in alignment with** |
| "base"<br><br>['970 Patent, Claim 11] | **plain and ordinary meaning** |
| "mattress tray"<br><br>['970 Patent, Claim 11] | **plain and ordinary meaning** |
| "means to provide heat to the infant supported on said mattress tray"<br><br>['970 Patent, Claim 11] | Function:  **to provide heat to the infant supported on the mattress tray**<br><br>Structure: **heater unit** |
| "mounting means adapted to mount said mattress tray to said base to be rotatably movable about a central pivot point movable about a central pivot point to enable said mattress tray to rotate 360 degrees about said central pivot point"<br><br>['970 Patent, Claim 11] | Function: **to mount the mattress tray to the base to be rotatably movable about a central pivot point to enable the mattress tray to rotate 360 degrees about the central pivot point**<br><br>Structure:  **a pivot affixed to a translation platform, said translation platform fitted atop a tilt platform** |

| Term/Phrase | Court's Adopted Construction |
|---|---|
| "means to translate said mattress tray along a straight linear path."<br><br>['970 Patent, Claim 15] | Function: **to translate the mattress tray along a straight linear path**<br><br>Structure:  **a translation platform containing parallel slots with interfitting parallel stubs.** |
| "a generally planar infant bed affixed to said frame"<br><br>['010 Patent, Claims 1, 7] | **plain and ordinary meaning** |
| "impinge upon said planar infant bed in a substantially uniform pattern"<br><br>['010 Patent, Claims 1, 7] | **plain and ordinary meaning** |
| "said reflector . . . formed in the geometric shape selected from the group consisting of an ellipsoid, a paraboloid and a hyperboloid"<br><br>['010 Patent, Claims 1, 7, 8] | **said reflector . . . formed in the geometric shape of an ellipsoid, a paraboloid or a hyperboloid, and no other shape** |
| "said drawer is moved to a position inwardly with respect to either of said lateral sides of said infant platform" (Claim 1)<br>/<br>"said drawer is moved to a position with respect to either of said lateral sides of said infant platform" (Claim 7)<br><br>['634 Patent, Claims 1, 7] | **plain and ordinary meaning** |
| "to allow a person to sit alongside said lateral sides without encountering said drawer"<br><br>['634 Patent, Claims 1, 7] | **plain and ordinary meaning** |

| Term/Phrase | Court's Adopted Construction |
|---|---|
| "said base comprises a pair of C-shaped members oppositely positioned so as to have their free ends projecting outwardly toward the lateral sides of said infant care apparatus, wherein the inwardly directed center portion of said C-shaped members allow a chair to be placed beneath said infant care apparatus without encountering said base"<br><br>['634 Patent, Claim 2] | **said base comprises a pair of C-shaped members oppositely positioned so as to have their free ends projecting outwardly toward the lateral sides of said infant care apparatus, wherein the inwardly directed center portion of said C-shaped members allow a chair to be placed beneath said infant care apparatus without encountering said base** |
| "said base has a generally inwardly directed center section at both lateral sides of said infant care apparatus to enable a piece of furniture to be positioned beneath said infant care apparatus without encountering said base"<br><br>['634 Patent, Claims 4, 9] | **plain and ordinary meaning** |
| "said drawer moves away from said center position by sliding in either of two directions along a path at a right angle with respect to said lateral sides of said infant platform"<br><br>['634 Patent, Claim 8] | **plain and ordinary meaning** |
| "means to sense an alarm condition indicative of a parameter of the apparatus or a condition of a patient supported on said surface"<br><br>['437 Patent, Claim 1] | Function: **to sense an alarm condition indicative of a parameter of the apparatus or a condition of a patient supported on the surface**<br><br>Structure: **sensor** |
| "means responsive to the sensed alarm condition to cause said audible alarm sounding device to produce an audible sound"<br><br>['437 Patent, Claim 1] | Function: **to respond to the sensed alarm condition to cause the audible alarm sounding device to produce an audible sound**<br><br>Structure: **electrical circuit** |

| Term/Phrase | Court's Adopted Construction |
|---|---|
| "a non-hand contact alarm silence switch mounted within the patient care apparatus adapted to be activated without physical contact with a hand of a care provider to disable said audible alarm device"<br><br>['437 Patent, Claim 11] | **an alarm silence switch mounted within the patient care apparatus adapted to be activated without physical contact with a hand of a care provider to disable said audible alarm device** |
| "to silence the audible alarm."<br><br>['437 Patent, Claim 11] | **plain and ordinary meaning** |
| "an infant platform on which an infant is adapted to be positioned" (Claim 1) /<br>"a base having an infant platform on which an infant is adapted to be positioned" (Claim 16)<br><br>['586 Patent, Claims 1, 16] | **plain and ordinary meaning** |
| "the controller being programmed to provide a pre-warm cycle to energize the radiant heater in advance of placing an infant on the infant platform for a period of time to warm the infant platform"<br><br>['586 Patent, Claim 1] | **the controller being programmed to provide a pre-warm cycle to energize the radiant heater for a period of time to warm the infant platform in advance of placing an infant on the infant platform** |
| "pre-warm cycle"<br><br>['586 Patent, Claim 1] | **a period of time to warm the infant platform in advance of placing an infant on the infant platform** |
| "a signal means to alert a user when the radiant heater has been energized for a sufficient period of time during the pre-warm cycle to allow an infant be placed on the warmed infant platform."<br><br>['586 Patent, Claim 1] | Function: **to alert a user when the radiant heater has been energized for a sufficient period of time during the pre-warm cycle to allow an infant be placed on the warmed infant platform**<br><br>Structure: **control module containing a controller and electrical controls** |

## IV.    Conclusion

For the above reasons, the court construes the disputed claims as noted and so **ORDERS**. No further claim terms require construction.

**IT IS FURTHER ORDERED** that this case is set for a **Scheduling Conference** on **January 22, 2016, at 9:30 a.m.**, in Courtroom 7, Seventh Floor, United States Courthouse, 501 W. 5th Street, Austin, Texas 78701.  The parties shall meet and confer in advance of that date in an attempt to settle this case.  If the case is not settled, the parties shall confer in an attempt to reach agreement on a schedule to follow for the remainder of this case.  The court will render a scheduling order as a result of the conference.

SIGNED this 20th day of November, 2015.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE